**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| NEJLA K. LANE, an Individual, and ) <br> LANE LEGAL SERVICES, P.C., an Illinois ) <br> Professional Corporation, ) <br>   ) <br> Plaintiffs/Counter-Defendants, ) <br>   ) <br> vs. ) <br>   ) <br> STEPHEN KENJI LE BROCQ, an Individual ) <br>   ) <br> Defendant/Counter-Plaintiff ) | Case No.: 1:15-cv-06177 <br><br> Judge Ruben Castillo <br><br> **JURY TRIAL DEMANDED** |

**DEFENDANT/COUNTER-PLAINTIFF'S EMERGENCY MOTION TO
STAY DISCOVERY, FOR DISMISSAL AND DISCOVERY SANCTIONS**

COMES NOW Defendant STEPHEN KENJI LE BROCQ ("Le Brocq"), by and through his undersigned counsel, LE BROCQ LAW FIRM PLLC and CLARKE DEMEO & BEARD, P.C., and for his motion as hereinabove captioned, would show unto this Court as follows:

**I.      INTRODUCTION**

This Court was put on prior notice that these proceedings were fraudulent—such assertions were made in several motions, memorandums, and pleadings filed by Le Brocq: that this Court is being used as a vehicle to oppress Le Brocq pursuant to Nejla Lane's ("Lane") agenda in destroying Le Brocq's life, ending his career, and causing him to expend tens of thousands of dollars in defending this wholly frivolous matter, to no foreseeable end.

Indeed, in its opinion partially granting and denying Le Brocq's Rule 12 motions, this Court stated that Le Brocq could not seek relief at that juncture because the court necessarily had to accept Plaintiffs' allegations as true, further stating that "if it is proven at a later stage of the litigation that Plaintiffs' allegations have no basis in fact, Defendant is free to renew his request

for sanctions under Federal Rule of Civil Procedure 11". *Lane v. Le Brocq*, No. 15 C 6177, 2016 U.S. Dist. LEXIS 40667, at *50 (N.D. Ill. Mar. 28, 2016).

Fortunately for Le Brocq (and this Court), that stage in this litigation has arrived. It occurred last week in Chicago, Illinois where Lane, through her conduct, did everything possible to obstruct her deposition. Lane repeatedly asked Le Brocq to answer the questions she was being asked; Lane uttered profanity and vulgarities upon the record countless of times. Lane's counsel requested to go off the record on multiple occasions to cure this behavior. Lane, instead of listening to her attorney, persisted with her outrageous conduct. Lane's counsel had to apologize many times for Lane's behavior. Lane's counsel had to instruct her how to answer the questions. It got to the point where even Lane's counsel could not handle it anymore, he screamed to Lane: "**why do you even need me here? He's asking you a question, you're not answering it. You're not listening. Listen to the question and answer the question!**" (Original Video Deposition of Lane at 16:39:17) (USB flash-drive included herewith) (hereinafter labeled as "V:").

Lane decided to terminate her deposition early, to which Le Brocq objected. Le Brocq previously notified Lane (and all of her lawyers), that the deposition would be from 10:30AM to whenever testimony was concluded. One of Lane's attorneys responded (2 days before the deposition) asking if the deposition could be moved until 1:00 PM, and stating that "[they] will be leaving at 5:00 p.m." Le Brocq responded that he was intending on deposing Lane up to 7 hours pursuant to Rule, and proposed Lane to pay the extra costs associated with overtime rate for deposition staff. Le Brocq stated "I already have to go out of my way and waste money on hotel, plane, and court reporters…"

Neither Lane nor her attorneys responded to this e-mail. Instead, Lane proceed to arrive late to the deposition, failed to bring any documents requested, and proceeded to obstruct the deposition

as previously noted herein. The deposition ended on October 12, 2016 shortly after 5:00 PM (less than 4 hours), over Le Brocq's objections. Lane was unwilling to continue the deposition anytime during Le Brocq's stay in Chicago that she was notified was very difficult to attend. Lane was notified that Le Brocq had to file various motions for continuances in several of his Texas cases and that he spent thousands of dollars for last week's Chicago trip.

The very next day after the deposition, Lane sent two Notice of Depositions for third party witnesses for dates Le Brocq informed her would be inconvenient. Lane further stated that all of the depositions Le Brocq previously noticed for her employee's depositions could not occur because they were not "available". Le Brocq then arrived on time to his deposition at Lane's office on October 14, 2016, where Lane proceeded to harass Le Brocq, stating that she would **"punch him in the face" to "meet him outside" and jokingly asking about Le Brocq's father's cancer.** Lane then, again, over Le Brocq's objection, ended the deposition early, with hours remaining during the regular work day.

This conduct makes it clear that Lane is not only abusing the discovery process—but that she is intentionally finding ways to make it expensive and unduly burdensome for Le Brocq. More importantly, Lane's testimony reveals that she has forged documents in these proceedings, that she did not investigate her "verified" claims, that she lied in response to written discovery requests, that she lied in her verified pleadings, and that she lied during her deposition (and sworn pleadings/discovery respponses). We have enclosed a copy of Lane's video deposition and request it to be viewed in-camera because, if a picture is worth a thousand words, a video is undoubtedly worth millions.

Le Brocq files this as an Emergency motion because the interests of justice require that Lane's conduct be stopped forthwith before she continues to abuse the power this court affords her (further

untimely depositions are scheduled to occur within a week or less from the filing of this motion). A transcript is not available for the proceedings so Le Brocq has spent his weekend examining the rushed-video tape and transcribing the relevant portions, but has ordered a copy of the transcript. **Le Brocq urges this court to stay all discovery in this matter, pending a ruling** of this Motion to Dismiss and to dismiss Plaintiffs' frivolous case in its entirety with prejudice as to refiling and enter an award of sanctions and costs against Plaintiffs Nejla Lane and Lane Legal Services, P.C. pursuant to Federal Rule of Civil Procedure 11– and put this frivolous matter to bed.

## II. THE DEPOSITION OF PLAINTIFF NEJLA LANE

### A. Lane's Failure to Comply With Elementary Rules Regarding Depositions

From the outset of Lane's deposition, Lane made it her goal to deliberately impede the due administration of questioning. Lane stated she knew and understood the rules as they pertain to depositions, but when asked to explain them, Lane stated "I don't have to explain them to you… Move on. Ask your questions counsel." (V: 13:16:00). Le Brocq then asked if Lane understood that she must give truthful answers, to which she responded "I do, do you?" Lane's counsel then requested to go off the record so he could talk to Lane about her conduct. (V: 13:19:00).

When back on the record, Le Brocq asked Lane to state her understanding of Federal Rule of Civil Procedure 11, Lane—in her continued defiance – responds "why don't you state it to me." (V: 13:22:00). Lane eventually admitted that she understands Rule 11 and that she is admitted to practice in multiple United States District Courts, including the Northern District of Illinois. Lane, a seasoned attorney, was then asked about "verified pleadings" to which she initially responded that "verified" means that she made sure to have enough inquiry into the matter. (V: 13:31:50).

Importantly, Lane finally admitted to knowing that "verified" means the allegations are sworn and she further testified that all of her allegations were in compliance with the Rule and that no

allegations specified that further discovery was needed as per Fed. R. Civ. P. 11(b)(3). As swiftly and concisely as possible, Le Brocq will delineate *portions* of attorney/party Lane's misconduct during the deposition proceedings:

- When asked to authenticate a copy of an exhibit, Lane remarked: "That iPad was bought with my money." "He robbed me." (V: 13:37:25).
- When asked about whether or not Lane forged an exhibit, she responds "Why would you draft it, it was not signed…" "He knows that answers and he is playing a show". (V: 13:49:19).
- When asked to respond to a question about a hypothetical because Lane contended her actions were proper, she states "I'm not here to answer hypotheticals." Her attorney then instructed to answer and he will object if needed. (V: 13:50:30).
- When asked to read a statute for the record, Lane responds "you can read it— English is your first language, not mine." (V: 13:55:42).
- When asked what the ARDC is, Lane states "your guess is as good as mine." (V: 14:50:48). Lane then proceeds to demand to Le Brocq to "look at my face when you ask that question."
- When asked for her understanding of a 1099-MISC Income form, Lane states "well, even thieves have to pay taxes." (V: 14:28:10).
- When questioned as to who files her taxes, Lane responded, "it's none of your business—Turbo Tax for all I care." (V: 14:31:06).
- When asked to read portions of an exhibit propounded in response to a request for production, Lane states "you read it… sounds like you know what you are talking about." (V: 14:34:52).
- When asked about notations for advancements where Lane claims money was advanced, she states "you were a thief and took advantage of the money." (V: 14:41:07).
- Without a pending question, Lane states "you are ungrateful person you know that?" Lane's counsel then states for her to be "quiet". (V: 14:45:00).
- When asked if personally handled a matter that the law firm handled, Lane remarks "greedy asshole—my money, my firm". (V: 14:58:20). We then went off the record due to Lane's conduct.
- Lane's counsel pushes her back while Lane stated "asking same bullshit" "he's a thief." Lane's counsel further tells her to be quiet. (V: 15:35:56).
- Lane then states: "give me my money back—return all my money, you thief" (V: 15:36:17). Lane's counsel then states to just answer the question. How hard could it be? (V: 15:36:24).
- "He knows we got him by the balls." (V: 15:36:34). Lane's counsel responds: "you are on videotape. You are not helping your case." (V: 15:36:42).
- When asked when Lane received notice of termination, she responds "the defendant knows his intent of his e-mail, I cannot read his sick mind." (V: 16:20:10).

Page **5** of **16**

- Again, without a pending question "will I ever help a beggar off the street like you… his brothers are autistic…. You go straight to Hell for what you did to Ms. Lane." (V: 16:27:20).
    - Do you have conscience? (V: 16:28:32).
    - Do you fear God? (V: 16:28:33).
    - You worthless piece of shit (V: 16:28:57).
    - Scum of the earth (V: 16:29:19).
    - Clever, slick, con-artist (V: 16:29:38).
    - Go to Hell (V: 16:29:47).
- Regarding taxes, "even thieves have to pay taxes" to which Lane's counsel states: that's not an answer, it's yes or no. (V: 16:40:50).

It is clear that the conduct of Lane was, at best, inappropriate and obstructive. The foregoing are excerpts from the video-recorded proceedings. If Le Brocq were to cite each and every instance where proceedings were disrupted or otherwise, where profanity were used, Le Brocq would exceed this Court's 15-page limit. Le Brocq welcomes this Court to review the entire video, or the off the record proceedings that Lane decided to record on her cell phone without the parties' stipulation. The real issue, however, is what was revealed during these proceedings—Lane's patent untruthfulness.

### B. Lane Forged Exhibit A of Her Pleadings

A pivotal issue to Lane's frivolous claims is a contract she alleges (which Le Brocq hotly disputes) that was alleged to be entered into on May 22, 2013. Lane's initial complaint reads as follows:

> This Contract # 1 was valid from May 22, 2013 through December 31, 2019. After his employment contract was signed, Defendant placed it in his own personnel records along with his resume, transcript, etc. (*See* Exhibit A, Employment Contract # 1) (Emphasis in original). (Doc. 1, paragraph 19).

Lane affixed a copy of this purported agreement to her Verified Complaint as Exhibit A. The exhibit represents it is signed by way of a "/s/" both for Stephen Le Brocq and Necla [sic] Lane. See Exhibit A, page 3 of the Complaint. Le Brocq first raised this issue (that the document was forged) by way of his Rule 11 letter attached to his first Rule 11 motion. (Doc. 23-1, page 3)

(stating how the Exhibit was forged and that "[i]t does not take a handwriting expert to know that plaintiffs forged exhibit A to the lawsuit.")

Lane then decided to amend her verified lawsuit, with her "First Amended Verified Complaint" filed on November 28, 2015 (more than 4 months later). She now changes her allegations by adding to the same paragraph that "[the contract] is currently in [Le Brocq's] possession." (Doc. 36, paragraph 26.) Lane further adds a footnote that states "[o]n or before departing LLS, Le Brocq, among other things, took the only signed copy of Contract # 1 with him. Exhibit A is an **unsigned copy** of said contract." (*Id*. at footnote 1).

Apparently, Lane has now taken the position that the document she represented was a "true and correct copy" to her sworn pleadings that had "/s/" affixed is now an "unsigned" copy. Lane further repeats that "it's not signed" in her deposition (V: 13:34:09); (V: 13:34:16). She then states to "look at the agreement" saying that the document "states the original has signatures". (V: 13:34:28). Of course, the document does not state that. Lane is then asked as to who affixed the mark, which she responds "either me or my office." (V: 13:34:50). Upon further question, Lane states "it could be me." (V: 13:35:14). Then, finally, Lane admits that "I affixed that to show original is not in my possession." (V: 13:35:19).

Lane is then confronted with her differing allegations in her pleadings, failing to understand that verified pleadings are verified pleadings, subject to perjury that can be used even if amended. (V: 13:36:15). Lane explains her changes as follows: "there were so many pages and umm—I did as best detail as I could. And if there was something not clear to third party, I amended to put detail to avoid the – um – ambiguity". (V: 13:43:17). Lane then is directed to her Responses to Requests for Admissions asking if the document was forged. Lane then states it "could be" a stand-in for the original signature. (V: 13:45:58).

Then, Lane is confronted with more of her (contradictory) sworn responses: her First Amended Responses to Request for Admissions. There, Lane now states that the "electronic signatures" were simply "place holders". So now, these "unsigned" exhibits bear "electronic signatures"—notwithstanding the fact that Lane testified many times the documents were never signed. Lane then calls the agreements where she affixed the "marks" as her "best evidence". (V: 13:51:10). Lane then is presented with a hypothetical situation and the law stating if documents are *missing* that an affidavit is required under Illinois law. Her original complaint did not contain such and her response is "drafting as much detail as I did—might have been an oversight. Do you want me to amend it again"? (V: 13:53:30). "To the best of my ability with my verification, I attached evidence thereof." (V: 13:53:49).

Finally, Lane is presented with a subpoena return from her previous attorneys, LaRose & Bosco, Ltd., asking for all documents given to them by Lane, including all contracts or purported contracts. When asked if she ever gave Exhibit A to her prior lawyers, first, Lane states "no, what are you talking about"? (V: 13:57:57). She changes her testimony when she sees the documents. When questioned why these documents do not contain the signature from the Exhibit A filed in court, Lane states "this is the best evidence" (V: 14:01:40). Lane then views the draft copy of their lawsuit and it admits it states "unsigned copy".[1] (V: 14:04:14).

Lane never had a signed copy of Exhibit A to the complaint of First Amended Complaint in this matter. Her previous lawyers indicated on their pleadings it was "unsigned". Lane, knowing that more than half her allegations are premised on this document, affixed "/s/" without Le Brocq's permission or knowledge. When Le Brocq points this out, Lane amends saying Le Brocq took it

---

[1] Lane's "excuse" that omitting the language that Le Brocq allegedly removed the only signed copy of Exhibit A and forgetting to state that Exhibit A was "not signed" as a mere "oversight" strains credulity—especially because her previous lawyers specifically mark in their pleadings "unsigned" copy, whereas Lane makes no mention until faced with allegations of forgery through a Rule 11 letter.

Page **8** of **16**

with him. She then states it is unsigned. She then states it is a stand-in for the signature. She then states it is an "electronic signature". Lane changes her explanations so many times for one singular reason: she forged the document and got caught. She intended to defraud and mislead this court and the public by and through her actions.

### C. Lane Also Lied About the Employment Contracts

Lane constantly (in her pleadings and elsewhere) states that Le Brocq "forced" her to sign Exhibits C and D of her First Amended Complaint. Agreements Lane categorizes as "supplements[2]" that she "never instructed Le Brocq" to draft and that were drafted in furtherance of Le Brocq's crime, agenda, strategy, and ploy. But in Lane's deposition, she admits that she wrote a letter to the ARDC stating that Le Brocq "actively" and "competently" negotiated each of Le Brocq's professional contracts with the firm. (V: 14:16:20).

At Lane's deposition, she is confronted with her response to Defendant's Request for Admission # 9, wherein Lane states that checks for $5,000.00 paid from May 2014- January 2015 were "advancements pursuant to contract # 1" and *denies* they were salary payments. (V: 14:21:41). Lane then states anything in excess of $3,000.00 were only advancements from contract #1. (See arguments *infra* as to the forged Exhibit A). (V: 14:21:55).

Next, Lane states that Le Brocq's salary was never to increase when he was licensed to practice law. That in fact, anything in excess of $3,000.00 was purely advancements. (V: 14:22:55); (V: 14:23: 50) (V: 14:25:00). Lane was asked how many times she made this averment, asked if over

---

[2] The fact that Lane labels these contracts as "supplements" is crucial and goes to Lane's motive in forging Exhibit A. If Lane did not forge Exhibit A, she could not contend it was the operative agreement, which would destroy her false statements that all compensation in excess of what's contemplated in Exhibit A are "advancements". The "supplements" indicate the funds are salary and compensation. For example, Lane claims that $55,000.00 from a fee-sharing provision of the "supplemental contract" was an advancement pursuant to Exhibit A (See FAC ¶¶45,46.) Without forged Exhibit A, Lane could no longer dispute the fact that the $55,000.00 was paid pursuant to the actual fee-splitting provision referenced in the "supplements".

"100 times" sounded correct, responding "it's possible." (V: 14:32:20). Lane then admitted she gave the ARDC a detailed supporting analysis of income given to Le Brocq (V: 14:32:50). Lane then authenticates the document she provided in response to Defendant's request for production showing same. (V: 14:33:35). Lane then reads the document stating the dates and descriptions thereof, as "salary" for specific months. (V: 14:34:45).

When questioned as to why there are no indications that the checks paid marked salary and not advancements, Lane respond's, "the checks speak for themselves". (V: 14:41:20). Lane then states the "detailed analysis" is "internal notes" (V: 14:44:46). Lane is then presented with Exhibit M of her Complaint entitled "Cancelled Checks & ADP Payment History" pages 2-4 because, as Lane stated, the "checks speak for themselves." Lane again, categorically denied Le Brocq was to receive higher salary as a lawyer (V: 14:51:19). Lane read and acknowledged a sticky-note she appended to one of Le Brocq's checks as seen on page 2, Exhibit M, Plaintiffs' Complaint. (V: 14:52:00). It reads:

> **"Dear Stephen, please find enclosed, your salary for 2014. You'll make more as Esquire."** (Emphasis added).

Lane acknowledged that "esquire" means "attorney". (V: 14:52:19). And that Le Brocq was licensed on April 30, 2014, thereby making his first month as a licensed attorney as May 1, 2014. (V: 14:53:21). Lane was then asked, if no agreement existed for the salary increase, why was Le Brocq paid $5,000.00 for May of 2014, June of 2014, July 2014, and so-on and so-forth. Lane's incredible response, "identification purposes only." (V: 14:53:45).

If the Court is not already convinced that Lane was untruthful (where she recognizes she makes the statement regarding loan/advancement versus salary over one hundred times under oath), her next statement should serve to foreclose any doubt this court may have. Lane is asked, why on an Income Report propounded as a response to request for production, why a payment is not listed as

advancement, versus income? (V: 15:32:14). **Lane states "there is only a transaction number"** and proceeds to stick up her index finger where she states **"had I written you a check, it would have been in the memo section."**

It took nearly two hours of questioning Lane to reveal what she knew from the outset—it's what commonsense dictates—and it is the truth in this matter. It was what Lane was trying to misconstrue throughout her pleadings, discovery responses, and testimony: if she paid Le Brocq advances as she testified she did, "**it would have been in the memo section**". Salary was listed on the "memo section" not advances—because the payments were salary.

### D. Lane Also Lied Stating She Advanced Le Brocq $55,000.00 In Funds

Le Brocq is assured that, based on the detailed nature of this Court's opinions, it is very familiar with Lane's allegations. One of those being an alleged "$55,000.00 advancement". (Doc. 36, ¶ 47). Same is stated in Lane's original complaint. In fact, Lane puts quotes in her averments indicating certain words were said prior to the "advancement being given." Lane admitted that she transferred $55,000.00 into her personal account as well. (V: 15:14:50). Lane stated she was familiar and understood IOLTA Rules. (V: 15:17:15). Lane stated she advanced funds from her IOLTA account. (V: 15:18:12). Lane later admitted that she didn't make the required records of this supposed advancement. (V: 15:20: 25). Lane admitted that the firm received $220,000.00 as attorney's fees from a confidential case. (V: 15:24:40). Admitted that $55,000.00, mathematically speaking, is 25% of $220,000.00. (V: 15:25:48). Admitted that it's the same fee-distribution contemplated in Exhibit C of the Complaint (fee-splitting contract). (V: 15:25:59).

Lane was instructed to read text a message she wrote to Le Brocq. The message indicated that Lane needed "monies from REDACTED and REDACTED back" since Le Brocq was already paid "handsomely" through salary. (V: 15:42:03). Lane admits that these "monies" were from the

contingencies fees. (V: 15:42:36). As Lane's attorney quickly notices, Lane tries to add text into the message stating "extra monies" – Lane's attorney states "it does not state that". Lane then states "the two client's cases are contingent" (V: 15:42:58). When asked if the funds paid just so-happened to coincidentally be the same as what the contract stipulates, Lane states "you can call it whenever you want... coincidently or without coincidence." (V: 15:49:45). When presented with e-mails as to compensation paid, Lane states "I was paying you boat-load of money". (V: 16:21:35). When asked about advancements versus being paid, Lane changes her testimony to say it says "[Le Brocq] is in possession of [my] money" ignoring the fact that she just testified that she paid it all to Le Brocq (V: 16:22:00). Lane states in her e-mail, and admits, that she *gave* Le Brocq all the contingencies. (V:16:28:47). Finally, Lane admitted she told the ARDC that "Le Brocq was paid in full accordance with his agreements" and that if "Le Brocq is, in hindsight, unsatisfied with those arrangements, he cannot dispute it." (V: 16:32:59). It's clear the $55,000.00 was paid pursuant to contracted listed as Exhibit C's fee-splitting provision, and not an "advancement".

### E. Lane Lied About Le Brocq Stealing The Firm's Computer, Monitor & Safe

Through Lane's pleadings, she alleges that Le Brocq stole the law firm's computer and monitor. In response to request for admission 27, Lane states that Le Brocq purchased items with his card, but had access to LLS' funds, so "indirectly used LLS funds:" (V: 16:42:40). In same response to admission, Lane admits that she was presented with Best Buy credit card statement for items referenced in paragraph 28 of request, but then denies knowing if it's the same items. Lane also, in response to Interrogatory 12, states "Defendant was permitted to utilize LLS cash to purchase said computer and monitor. However, Defendant purchased the computer and monitor with his Best Buy card." In short, Lane goes from Le Brocq stole the computer, to Le Brocq "indirectly used LLS funds to buy the computer" to "Le Brocq used LLS cash to pay his card". It

is notable that Lane testified she never investigated how the Best Buy Card was paid for. (V: 16:47:00). Lane also recognizes that allegations regarding the computer were not on information and belief (V: 16:48:23). Lane's response- what discovery is needed? (V: 16:48:35). Lane also lies about Facebook posts she makes stating Le Brocq stole the computer and recognizes in her multiple text messages, she told Le Brocq to bring "his" computer back—Lane's response was to "identify the computer [Le Brocq] used exclusively." (V: 16:53:40). Again, Lane's allegations that Le Brocq stole the computer and monitor are patently false.

The same is true about the "firm's safe". Lane testified that it contained firm money (V: 16:59:19) and that Le Brocq stole money from the safe that she wanted back. (V: 17:00:48). Lane was then presented with a text message from her stating for Le Brocq to pick up *his empty safe* that *he left behind*. Lane's explanation to this: she asked for a cashier's check for the stolen funds from the safe (V: 17:03:43). When further questioned, Lane finally admits that the funds referred to for which she wanted a cashier's check were from contingency settlements (V: 17:05:17). Lane's response to why the change in testimony: "I don't know; you know my state of mind at the time." (V: 17:05:49). Clearly, and again, Lane lied about this. The safe was not the firm's and there was never any money in it. Because Lane cancelled the depositions early, no other testimony could be extracted as to all other frivolous claims.

### III. ARGUMENTS—THIS CASE SHOULD BE DISISSED WITH PREJUDICE

"Rule 11 requires that an attorney or party certify, to the best of his 'knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,' that any pleading presented to the court is not presented for an improper purpose, that the claims therein have a legally sufficient basis, and that the allegations and other factual contentions have evidentiary support." *Jimenez v. Madison Area Technical College,* 321 F.3d 652, 656 (7th Cir. 2003) (citing

Fed. R. Civ. P. 11(b)). One of the basis purposes of Rule 11 is to deter baseless filings in the district court. *Id.* at 656 (citing *Cooter & Gell v. Hartmax Corp.,* 496 U.S. 384, 393, 110 S. Ct. 2447 (1990)). Courts may impose sanctions on a party or a party's counsel for failing to comply with Rule 11. *Id.* (citing Fed. R. Civ. P. 11(c)). These sanctions may include attorney's fees and costs and dismissal of a lawsuit.

Although dismissal of a lawsuit under Rule 11 is a severe sanction, "courts within the Seventh Circuit have held that the court system has 'zero tolerance for parties who seek to intentionally distort the discovery and trial process.'" *Bogdan v. Eggers,* 2000 U.S. Dist. LEXIS 18225, Nos. 96 C 1609, 96 C 1611, 2000 WL 1847608 at *12 (N.D. Ill. Dec. 2000) (Keys, M.J.)(internal citations omitted). Courts have found the acts of falsifying documents and suborning perjury to fall within the type of misconduct that will not be tolerated. In *Jimenez v. Madison Area Technical College,* 2001 U.S. Dist. LEXIS 25077, No. 00-C-424-C, 2001 WL 34382042 at *7-8 (W.D. Wis. Aug 13, 2001) (Crabb, J.), for example, the district court dismissed the plaintiff's discrimination suit with prejudice and entered an award of monetary sanctions against the plaintiff's attorney pursuant to Rule 11 after it found that the plaintiff had relied on falsified documents to bolster her discrimination claims. The Seventh Circuit affirmed the district court's sanction order and found the sanction to be within the trial court's discretion "in light of the willful and malicious nature of Jimenez's flagrant Rule 11 violation." *Jimenez,* 321 F.3d at 657.

Other cases have been dismissed pursuant to Rule 11 for similar misconduct by a plaintiff. *See e.g., Bogdan,* 2000 U.S. Dist. LEXIS 18225, 2000 WL 1847608 at *12 (dismissing plaintiffs' case and awarding defendants their fees and costs pursuant to Rule 11 where plaintiff suborned perjury and concocted discrimination claims); *Pope v. Federal Express Corp.,* 974 F.2d 982, 984 (8th Cir.

1992) (affirming dismissal with prejudice of plaintiff's lawsuit as Rule 11 sanction where plaintiff manufactured evidence and offered perjured testimony to enhance her case).

As the Supreme Court has stated, the sanction of dismissal must be available to district courts in appropriate cases "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 647, 96 S. Ct. 2778 (1976). As stated in one court involving similar misconduct:

> Permitting this lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence is merely excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means. *Brady v. United States,* 877 F. Supp. 444, 453 (C.D. Ill. 1994) (citations omitted).

Furthermore, Federal Rule of Civil Procedure 37 also gives this Court the inherent authority to dismiss a plaintiff's action and impose attorney's fees. Le Brocq request it do so.

Le Brocq has spent hundreds of hours and spent tens of thousands of dollars in drafting motions, pleadings, written and oral discovery, plane tickets, hotel costs, taxis, attorney's fees, court reporters, etc… in defending what this Court can now see is an entirely frivolous action full of perjury solely to harass Le Brocq and waste all of his resources. Because of Lane's abusive tactics, Le Brocq's trip to Chicago last week was virtually a waste of thousands of dollars. Instead of preparing his week for cases in Texas right now (1:00 AM), he is forced to bring this motion— so Lane can stop abusing him and our justice system—with only a few hours of sleep. Lane's egregious and intolerable conducts warrants one thing: that this action be dismissed with prejudice and with costs and attorney's fees to be awarded to Le Brocq. It is clear that Lane will not stop her harassment without court intervention. Alternatively, Le Brocq requests sanctions in the award of costs expended on his trip to Chicago, the costs of deposition/videographer, and attorney's fees.

WHEREFORE, based on the foregoing, Defendant/Counter-Plaintiff STEPHEN KENJI LE BROCQ prays for the emergency relief in the form of: stay of discovery pending the outcome of this motion; and, dismissal with prejudice of Plaintiffs' claims, with costs and attorneys' fees taxed against Plaintiffs, awarded to STEPHEN KENJI LE BROCQ. Alternatively, STEPHEN KENJI LE BROCQ prays this Court enter sanctions in the form of costs for his trip to Chicago, attorney's fees, and all costs associated with the depositions that were performed in bad faith and in violation of the Rules. STEPHEN KENJI LE BROCQ further prays for all further relief to which she shows himself to be justly entitled.

Respectfully Submitted,

**ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF**

| /s/ Stephen Le Brocq | /s/ Rodger Clarke |
|---|---|
| Stephen Le Brocq | Rodger Clarke |
| LE BROCQ LAW FIRM PLLC | Clarke, Demeo & Beard, P.C. |
| ARDC: 6315514 | ARDC: 6289233 |
| 13355 Noel Road, 11th Floor | 2720 South River Road, Suite 140 |
| Dallas, Texas 75240 | Des Plaines, IL 60018 |
| Tel: (469) 930-4385 | Tel: (847) 296-5311 |
| Fax: (866) 820-6005 | *Lead & Local Counsel* |

**CERTIFICATE OF CONFERENCE**

The undersigned attorney hereby certifies that, prior to the filing of this motion, he attempted to confer with counsel for Plaintiffs regarding the matters herein, to which Plaintiffs' counsel has wholly ignored and failed to respond.

/s/ Stephen Le Brocq

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that the aforementioned document was filed on October 17, 2016 through the Court's CM/ECF system. Parties of record may obtain a copy of the paper through the Court's CM/ECF system.

/s/ Stephen Le Brocq